665 So.2d 643 (1995)
STATE of Louisiana, Appellee,
v.
Robert THOMPSON, Appellant.
No. 27512-KA.
Court of Appeal of Louisiana, Second Circuit.
December 6, 1995.
*644 John M. Lawrence, Indigent Defender Office, for Appellant.
Richard Ieyoub, Attorney General, Paul Carmouche, District Attorney, Hugo A. Holland, Asst. District Attorney, for Appellee.
Before WILLIAMS and PRICE, JJ., and CLARK, J. Pro Tem.
CLARK, Judge Pro Tem.
Defendant, Robert Thompson, was convicted in the First Judicial District Court, Caddo Parish, of second degree murder. Because Louisiana does not recognize the defense of diminished capacity and because the mandatory life sentence for second degree murder has been repeatedly upheld, we affirm defendant's conviction and sentence.

FACTS
Defendant Robert Thompson was charged by bill of indictment with second degree murder in violation of LSA-R.S. 14:30.1. Following a bench trial, the trial court found defendant guilty as charged. The trial court denied defendant's post-verdict motion for acquittal and motion in arrest of judgment. Defendant appeals his conviction for second degree murder and the resulting mandatory sentence of life imprisonment at hard labor.
On November 14, 1993, the defendant told Peggy Miles and Billy Frank Smith he intended to kill Elizabeth Feaster. On the morning of November 15, 1995, Ms. Feaster's daughter, LaTonya Toliver, returned home from an overnight visit and discovered her mother had spent the night with a neighbor, Shirley Walker. As LaTonya entered the Walker apartment, the defendant forced his way in, walked upstairs to the bedroom where Ms. Feaster was sleeping, stabbed her repeatedly, and then ran from the apartment. As he was leaving, the defendant threatened Shirley Walker with the knife and told Kevin Myles that he had not stabbed the baby. Ms. Feaster died a few hours later at LSU Medical Center in Shreveport.
LaTonya Toliver, Kevin Myles, Shirley Walker and Toccara Walker were eyewitnesses to the murder and they identified the defendant from a photographic line-up. Rodney Smith also witnessed the murder but was unable to identify the defendant from the line-up. Thelma Jackson, the defendant's sister, testified that the defendant called her from jail and instructed her to tell anyone who asked that he was at her house on the morning of November 15, 1993. Ms. Jackson testified she did not know whether the defendant was in her home on the morning of November 15, 1993.
Dr. George McCormick, the Caddo Parish Coroner, testified that Ms. Feaster died from stab wounds in the right upper chest that penetrated her right lung, diaphragm, liver, and small intestine and from a stab wound to her neck that penetrated her thyroid gland. Based on the fact that the wounds were in vital areas, Dr. McCormick testified that it appeared the defendant's intent was to kill the victim. Furthermore, the absence of "defense wounds" on Ms. Feaster's hands indicated she either did not see the attack or was asleep or semiconscious when it occurred.
Approximately three weeks before the murder, the defendant repeatedly threatened to kill Ms. Feaster and feign insanity to avoid punishment. The defendant repeatedly professed love for the victim and became enraged when she refused to associate with him. Kevin Myles, Roseanne Smith, Shirley *645 Walker, Peggy Myles, LaTonya Toliver and Billy Frank Smith testified they heard the defendant threaten to kill Elizabeth Feaster. The defendant also told Roseanne Smith and Peggy Miles that he planned to feign insanity to avoid punishment for the murder.
Dr. Edward Leatherman, a psychiatrist, testified he had examined the defendant four times since 1988. After the initial examination in 1988, Dr. Leatherman could not determine if the defendant was competent to stand trial on unrelated charges. On Dr. Leatherman's recommendation, the defendant underwent evaluation at Feliciana Hospital. After his release, Dr. Leatherman determined that the defendant was competent to stand trial.
Prior to trial on the current murder charge, the defense moved for a sanity commission. At the completion of the examinations and hearings, Dr. Leatherman determined the defendant was competent to stand trial. Although he appeared to suffer low intelligence and organic brain dysfunction, a disease which causes faulty memory, due to a March 1982 gunshot wound to the head, Dr. Leatherman opined the defendant knew right from wrong. Dr. Leatherman also opined he believed the defendant was a malingerer who exaggerated his symptoms.
Dr. James Phillips, a psychiatrist, also had examined the defendant four times since 1988. After the first examination, Dr. Phillips concurred with Dr. Leatherman that the defendant should be institutionalized for further evaluation. After his hospitalization, Dr. Phillips concluded that although the defendant was borderline in his intellectual functioning, he was smart enough to strive diligently to look sick and to cop out on being a responsible person, feigning psychiatric illness. Dr. Phillips agreed with Dr. Leatherman's conclusion that the defendant could distinguish right from wrong.
After testing the defendant and evaluating his medical records, Dr. Allen Michael Johnson, a psychologist, concluded that the defendant suffered from a poor, irregular memory and organic brain syndrome, but displayed no sign of schizophrenia or psychosis. Dr. Johnson concluded that the defendant had poor impulse control due to alcohol abuse and the gunshot wound; however, he believed the defendant, at the time of his examination, knew the difference between right and wrong. Johnson would not comment on whether the defendant knew right from wrong at the time of the murder.
Dr. Mark Vigen testified that he agreed with Dr. Johnson's conclusions and stated that at the time of the interviews and tests the defendant knew right from wrong. Dr. Vigen was unable to offer an opinion as to whether he knew right from wrong at the time of the murder.
Dr. Kenneth Ritter, a psychiatrist called by the defense, agreed with Drs. Leatherman and Phillips that the defendant was competent to stand trial and knew the difference between right and wrong. Dr. Ritter testified the defendant had undergone a personality change as the result of the gunshot wound and was irritable, demanding, and intolerant to frustration. Dr. Ritter also stated the defendant suffered from faulty judgment and poor short term memory.
At trial and in the post verdict motions, defense counsel argued that the defendant's diminished intelligence, poor memory, and psychological problems prevented him from forming the specific intent required to convict someone of second degree murder. The trial court rejected this theory, found defendant guilty and denied post verdict motions on that ground.

LAW
The defendant assigned as error the trial court's denial of his motion to suppress and the state's use of other crimes evidence during the trial. Thompson did not brief these errors and expressly abandoned them on appeal. Assignments of error which are neither briefed nor argued are considered abandoned. State v. Schwartz, 354 So.2d 1332 (La.1978); URCA Rule 2-12.4; State v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir.1989), writ denied, 558 So.2d 1123 (La.1990).
In the trial court, the defendant filed a motion for post-verdict judgment of acquittal arguing the evidence, viewed in the light most favorable to the state, did not reasonably permit a verdict of second degree murder. *646 LSA-C.Cr.P. Art. 821. The trial court correctly denied the motion.

Sufficiency
The motion for post-verdict judgment of acquittal concerns the sufficiency of the evidence and presents a question of legal sufficiency. State v. Foster, 26,143 (La.App. 2d Cir. 12/9/94), 647 So.2d 1224; State v. Combs, 600 So.2d 751 (La.App. 2d Cir.1992).
Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the proper standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Hall, 26,505 (La.App. 2d Cir. 12/7/94), 647 So.2d 453; State v. Free, 26,267 (La.App.2d Cir. 9/21/94), 643 So.2d 767.
The Jackson standard is embodied in LSA-C.Cr.P. Art. 821 and is applicable in cases involving both direct and circumstantial evidence. State v. Smith, 441 So.2d 739 (La. 1983); State v. Thomas, 609 So.2d 1078 (La. App. 2d Cir.1992), writ denied 617 So.2d 905 (La.1993). An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Caston, 26,415 (La.App. 2d Cir. 10/26/94), 645 So.2d 1202; State v. Sutton, 436 So.2d 471 (La.1983).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Free, 26,267 (La.App. 2d Cir. 9/21/94), 643 So.2d 767; State v. Carey, 628 So.2d 27 (La.App. 2d Cir.1993).
In order to convict the defendant of second degree murder the state had to prove beyond a reasonable doubt that (1) the defendant killed a human being; (2) when the offender had a specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1. Over a three-week period the defendant told six people that he intended to kill the victim and told two of the six that he planned to feign mental illness to escape punishment. The night before the murder he repeated his threat to two people on separate occasions. In the early morning hours of November 15, 1993, the defendant entered Shirley Walker's apartment, walked upstairs and repeatedly stabbed Elizabeth Feaster in front of five eyewitnesses, four of whom later identified the defendant from a photographic line-up. At the time of the murder, Ms. Feaster was just awakening from sleep and the autopsy revealed she was unaware the attack was imminent. The evidence overwhelmingly supports a conviction for second degree murder.
The defendant's assertion that the offense was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control is meritless. The defendant asserts he was enraged by seeing Ms. Feaster in bed with another man. The record is devoid of evidence that would support his assertion and replete with evidence that indicates this was an act defendant had been considering for a minimum of two weeks. Defendant could not have known Ms. Feaster was sleeping with another man until after he burst into the Walker apartment carrying a knife and entered the bedroom. This assertion is meritless.
The defendant also argues on appeal that his "mental condition was so substantially affected that he was unable to form the requisite intent to kill or to inflict great bodily harm as required for second degree murder." Defendant admits the evidence did not establish that he was insane at the time of the murder; however, he asserts his diminished capacity precluded him from forming the requisite specific intent to commit murder. The defendant cites this court to State v. Lombard, 486 So.2d 106 (La.1986), in support of his assertion that mitigating factors may serve to negate the requisite specific *647 intent and reduce the degree of the crime. Defendant's reliance on Lombard is misplaced. In State v. Lombard, supra, the Louisiana Supreme Court held:
Manslaughter is a homicide which would be either first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. La.R.S. 14:31(1). Thus, the presence of "sudden passion" or "heat of blood" distinguishes manslaughter from murder. The court has stated on several occasions, however, that "sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. State v. Tompkins, 403 So.2d 644 (La.1981); State v. Temple, 394 So.2d 259 (La.1981); State v. Peterson, 290 So.2d 307 (La.1974). Since they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in a "sudden passion" or "heat of blood" is entitled to a manslaughter verdict. Where such proof has been introduced, a second degree murder verdict is inappropriate.
The supreme court indicated that sudden passion and heat of blood are mitigating factors in the nature of a defense which operate to lessen the culpability of the defendant; however, the holding in Lombard, supra, has not been extended to include other mitigating factors such as diminished mental capacity. The Lombard holding is only applicable in cases in which the defendant establishes by a preponderance of the evidence that he acted in sudden passion or heat of blood. Defendant cites no authority and our research has failed to uncover any support for the proposition that a defendant's diminished mental capacity, short of legal insanity, can operate to lessen his culpability, in the same fashion as heat of blood or sudden passion, and reduce the degree of the crime. Accordingly, we hold that Louisiana does not recognize the defense of diminished capacity and a mental defect or disorder, short of legal insanity, (i.e., the incapability to distinguish between right and wrong, LSA-R.S. 14:14), cannot serve to negate the specific intent and reduce the degree of the crime. See State v. Jones, 359 So.2d 95 (La.1978), cert. denied, 439 U.S. 1049, 99 S.Ct. 727, 58 L.Ed.2d 708 (1978); State v. Weber, 364 So.2d 952 (La.1978); State v. English, 367 So.2d 815 (La.1979); State v. Andrews, 369 So.2d 1049 (La.1979); State v. Lecompte, 371 So.2d 239 (La.1978); State v. Wade, 375 So.2d 97 (La.1979); State v. Murray, 375 So.2d 80 (La.1979); State v. Nelson, 459 So.2d 510 (La.1984); State v. Deboue, 552 So.2d 355 (La.1989); State v. Knowles, 598 So.2d 430 (La.App. 2d Cir.1992).

Mandatory Life Sentence is Constitutional
Defendant's other assignment of error asserts the mandatory life sentence for second degree murder as set forth in LSA-R.S. 14:30.1 is unconstitutional. Defendant argues that the mandatory life sentence violates the 1974 Louisiana Constitution Art. I Sec. 3 (equal protection) and Art. I Sec. 20 (excessive punishment). The assertion that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected. State v. Brooks, 350 So.2d 1174 (La. 1977); State v. Daniel, 378 So.2d 1361 (La. 1979); State v. Parker, 416 So.2d 545 (La. 1982); State v. Hereford, 518 So.2d 515 (La. App. 3d Cir.1987).
Defendant cites no authority nor offers any argument in support of his position that the mandatory sentence violates the equal protection clause. A mere statement of an assignment of error in a brief does not constitute briefing of the assignment, and, therefore, the assignment is deemed abandoned. State v. Williams, 632 So.2d 351 (La.App. 1st Cir.1993), writ denied, 94-1009 (La. 9/2/94), 643 So.2d 139.

CONCLUSION
Both assignments of error raised by defendant are without merit. The conviction of second degree murder and mandatory sentence of life imprisonment at hard labor without *648 benefit of suspension, probation, or parole are affirmed.
AFFIRMED.