716 So.2d 936 (1998)
STATE of Louisiana, Appellee,
v.
Quency WASHINGTON, Appellant.
No. 30866-KA.
Court of Appeal of Louisiana, Second Circuit.
August 19, 1998.
*938 Amy Ellender, La. Appellate Project, Mer Rouge, for Appellant.
Richard Ieyoub, Attorney General, Paul Carmouche, District Attorney, Donald E. Hathaway, Jr., Assistant District Attorney, for Appellee.
Before BROWN, CARAWAY and PEATROSS, JJ.
BROWN, Judge.
A jury found defendant, Quency "Lil Boo" Washington[1], guilty of the second degree murder of Earl "June Bug" McDowell. Defendant was sentenced to the mandatory term of life imprisonment without benefit of parole. Defendant has appealed his conviction and sentence. We affirm.

Discussion

Denial of Post-trial Motions/Sufficiency of the Evidence
Defendant filed motions for post-verdict judgment of acquittal and new trial, arguing that the evidence would not reasonably permit a guilty verdict. The trial court denied both motions. Defendant urges error in the denial of these motions, contending insufficiency of the evidence.
La.C.Cr.P. art. 851(1) provides that the court shall grant a motion for new trial whenever the verdict is contrary to the law and the evidence. A motion for new trial presents only the issue of the weight of the evidence. Under article 851(1), the trial court has wide discretion to determine the weight of the evidence and refusal to grant such a motion is not subject to appellate review, except for error of law. State v. Mitchell, 26,070 (La.App. 2d Cir.06/22/94), 639 So.2d 391, writ denied, 94-1981 (La.12/16/94), 648 So.2d 387.
La.C.Cr.P. art. 821 provides that a motion for post-verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in the light most favorable to the state, does not reasonably permit a finding of guilty. This is a question of legal sufficiency. State v. Combs, 600 So.2d 751 (La.App. 2d Cir. 1992), writ denied, 604 So.2d 973 (La.1992).
Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the proper standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir. 1992), writ denied, 605 So.2d 1089 (La.1992).
In order to convict defendant of second degree murder, the state had the burden of proving beyond a reasonable doubt that defendant killed Earl McDowell while possessing the specific intent to kill or inflict great bodily harm. La.R.S. 14:30.1; State v. Thompson, 27,512 (La.App. 2d Cir.12/06/95), 665 So.2d 643, writ denied, 96-0232 (La.04/26/96), 672 So.2d 679.
Furthermore, because defendant asserted that the killing was in self-defense, the state had the affirmative duty of proving beyond a reasonable doubt that the murder was not committed in self-defense. State v. Harvey, 26,613 (La.App. 2d Cir.01/25/95), 649 So.2d 783, writs denied, 95-0430, 95-0625 (La.06/30/95), 657 So.2d 1026, 1028; State v. Cotton, 25,940 (La.App. 2d Cir.03/30/94), 634 So.2d 937.
A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La.R.S. 14:20(1); State v. Mitchell, supra. However, a person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. La. R.S. 14:21.
The following evidence was presented by the state at trial.
*939 On December 9, 1996, during the late afternoon, Osie Thomas testified that he and a friend were putting Christmas lights on his house. Thomas's residence is directly across the street from Dewayne Brown's (defendant's uncle's) house at 606 W.64th Street. Thomas stated that he is related to defendant by marriage. Both defendant and Earl "June Bug" McDowell had been in Thomas's home earlier on the day of the shooting, watching television and talking to Thomas's wife.
Thomas stated that he saw defendant and McDowell outside talking. He then observed defendant leave the area going toward his house. (At trial, Thomas stated that he did not hear defendant and McDowell arguing prior to the shooting. At the preliminary examination, however, Thomas stated that the two had an argument prior to the incident.) Thomas stated that he did not see defendant again until after he heard a shot approximately five or six minutes later. Thomas then turned around and saw defendant shoot McDowell five times. Thomas testified that he did not see a weapon in McDowell's hands.
Charles Williams, a distant relative of the victim, testified that he was visiting at defendant's uncle's house on the day of the shooting. Williams stated that he had been drinking beer that day. Williams was outside the residence talking with defendant and several other people when McDowell came up and started talking to defendant. McDowell asked defendant if he knew him (McDowell). Defendant replied that he did not. Williams noted that he was unable to hear the rest of the conversation between defendant and McDowell. He further testified that he could not say what upset defendant.
At some point, defendant left and McDowell and Williams went inside Brown's home for five or ten minutes. Williams advised McDowell that he should go home. Williams, however, noted that he did not know why he told McDowell to leave. McDowell waited a few minutes, then went outside. By that time, defendant had returned to his uncle's house and he and McDowell resumed their argument. Again, Williams was unable to hear what was being said. Williams testified that he did not hear McDowell threaten defendant, nor did he see a box cutter or any other weapon in McDowell's possession. Williams also testified that he had heard that McDowell had recently been released from prison.
Williams stated that he was in Brown's yard when he heard a gunshot. At that time, he ran to the side of the house. He then observed defendant fire a second time. McDowell hit the ground after the second shot and "then a couple more shots went off "as McDowell lay on the ground. Williams did not see anyone go up to McDowell's body before the fire department arrived on the scene. Furthermore, as far as Williams knew, nothing was removed from the area around McDowell's body.
Detective James Sorrells of the Shreveport Police Department investigated McDowell's murder. Det. Sorrells arrived at the scene, spoke with Osie Thomas and obtained consent from defendant's mother to search her residence. Although no gun was recovered, a box of .32 caliber shells was found in the room defendant shared with his younger brothers.
Det. Sorrells was present when defendant gave a taped statement. The recording was played for the jury. In his statement, defendant claimed that McDowell was armed with a box cutter and that the shooting was in self-defense. Det. Sorrells noted that the murder weapon was not recovered. Furthermore, Det. Sorrells found no evidence other than defendant's statement which would indicate that McDowell was armed with a box cutter when he was shot by defendant.
Dennis George testified that he was visiting at defendant's uncle's home when McDowell and defendant got into their argument. George stated, "Well, when I got there I seen them arguing. I heard June Bug hollering bout that he'll rape him, rape Quincy. And Quincy kept saying that you don't know me, you don't know me and all that there. That's what I heard, that's what I saw." George noted that while he heard this threat, he did not think anything was going to happen between defendant and McDowell.
*940 Before George left, he saw McDowell "go towards" defendant, who backed up. This apparently occurred prior to the shooting. George did not see McDowell with a weapon, nor did he see the shooting or hear any shots. According to George, defendant lied in his statement to police when he said that George was standing next to him when he shot McDowell and that George had seen McDowell with a box cutter.
Dr. George McCormick, Caddo Parish coroner, testified about McDowell's autopsy which was performed by Dr. Brenda Rheames. McDowell had been shot six times, with one of the bullets severing his upper spinal cord in his neck. According to Dr. McCormick, this wound alone would have been fatal. Several of McDowell's internal organs were also damaged. Hemorrhaging of these organs, together with the severed spinal cord, caused McDowell's death. At the time of his death, McDowell's blood alcohol level was .15%. No cocaine or cocaine metabolite was found in the victim's system, which indicated that he had not used cocaine within twelve hours of his death.
As part of the defense strategy to prove that the shooting occurred in self-defense, defendant's counsel attempted to show that there was an opportunity for someone to remove a box cutter from McDowell's body prior to the arrival of fire department and police personnel. However, there was testimony from several witnesses who stated emphatically that no one went near the body prior to the fire department's arrival. Captain James Self of the Shreveport Fire Department testified that the unit responding to the call did not find a weapon in the area or on McDowell's person. Captain Self also noted that there was no one around the body upon their arrival, although there was a crowd gathered across the street.
We find sufficient evidence to support defendant's conviction for the second degree murder of McDowell. The testimony of the prosecution's witnesses established that defendant, after arguing with McDowell, left the area, but returned a short time later. Upon defendant's return, the argument resumed and ultimately ended with defendant shooting McDowell six times.
We further find sufficient evidence to support the jury's rejection of defendant's self-defense theory. While there was evidence that McDowell threatened defendant, no one witnessed any act in furtherance of this threat. None of the witnesses saw McDowell with a box cutter, nor was such a weapon found in the area or on the victim's body. Other than defendant's statement to police, there was no evidence that McDowell attacked defendant. We also note that even if the victim possessed a box cutter, once he fell to the ground, seriously wounded, there was no need for defendant to continue to shoot. These assignments of error are without merit.

State's Use of Written Materials During Voir Dire
During voir dire, over objection by defense counsel, the prosecutor passed out a pamphlet to prospective jurors which contained excerpts of the statutory definitions of second degree murder, manslaughter, criminal intent, justifiable homicide and the aggressor doctrine. As the prosecutor began to review the pamphlet with the prospective jurors, a bench conference was called. Thereafter, the prosecutor went on to explain to the prospective jurors that the written material contained a limited definition of second degree murder, one which was tailored to the facts and circumstances of the case. The prosecutor then read through the pamphlet. The record does not reflect any misstatement of the law by the prosecuting attorney. We also note that the pamphlets were collected from the prospective jurors and not used once the jury had been selected and seated.[2]
La. Const. Art. 1, § 17 guarantees that "[t]he accused shall have the right to full voir dire examination of prospective jurors...." La.C.Cr.P. art. 786 provides that the court, state and defendant shall have the right to examine prospective jurors and that the *941 scope of the examination is within the discretion of the court. The purpose of voir dire is to determine qualifications by testing a prospective juror's competence and impartiality. State v. Hall, 616 So.2d 664 (La. 1993).
Where, as in this case, an understanding of the applicable law is particularly critical to the issue of self-defense, both the state and defendant should be allowed to reasonably explore the prospective jurors' understanding of the pertinent law and legal principles. See State v. Hall, supra at 669. To handout pamphlets to prospective jurors, however, is freighted with potential harm as they may be perceived as having the imprimatur of the court and should not be encouraged. Even so, the record does not reveal that anything read by the prosecutor from the pamphlet would have influenced the jury or been unfairly prejudicial to defendant. Thus, if error, it was harmless. State v. Davis, 626 So.2d 800 (La.App. 2d Cir.1993). This assignment of error lacks merit.

Admissibility of Photographs
Defendant argues that the trial court improperly allowed the state to show to the jury pictures which were cumulative in nature and had no probative value other than to inflame the jury's sympathies. According to defendant, the state was able to show the extent of the victim's injuries through the testimony of the coroner and the photographs should have been excluded because they were inflammatory and highly prejudicial.
Photographs are generally admissible if they illustrate any fact, shed any light upon an issue in the case, or are relevant to describe the person, thing or place depicted. State v. Landry, 388 So.2d 699 (La.1980). The admission of photographs is not reversible error unless it is clear that their probative value is substantially outweighed by their prejudicial effect. State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190.
The trial court did not err in admitting the photographs into evidence. All that is depicted by the four 8×10 photos is the crime scene. One photo shows the front door of the residence. The remaining three photos show different angles of the house and driveway; in these photos, a shirt with blood on it is visible and there is blood on the ground near the shirt, which was worn by McDowell when he was shot. There is nothing about these pictures that could be considered gruesome. The trial court did not err in allowing these photos into evidence.
We further find no merit to defendant's argument regarding the cumulative nature of these pictures. The photos were properly admitted during Dr. McCormick's testimony regarding the nature and extent of McDowell's injuries. They were also used during George's testimony to show the jury where this witness was standing at the time of the argument and subsequent shooting. This assignment of error is without merit.

Exclusion of Hearsay Evidence as to the Victim's Character
Defendant contends that the trial court erroneously refused to allow evidence of the victim's reputation during Det. Sorrells' testimony. According to defendant, Det. Sorrells would have testified about McDowell's reputation for carrying a box cutter, which was relevant to show defendant's state of mind at the time of the shooting.
Evidence of a person's character or trait is generally inadmissible to prove that he acted in conformity therewith on a particular occasion. La. C.E. art. 404(A). An exception is in a homicide case where defendant claims self-defense and at issue are whether the deceased was the aggressor and defendant's state of mind. In such a case, evidence of the victim's dangerous character or threats against the accused is relevant because it tends to show that the victim was the aggressor and that defendant's apprehension of danger was reasonable. State v. Edwards, 420 So.2d 663 (La.1982); State v. Montz, 92-2073 (La.App. 4th Cir.02/11/94), 632 So.2d 822, writ denied, 94-0605 (La.06/03/94), 637 So.2d 499.
As to evidence of the victim's character and other crimes, wrongs or acts, La. C.E. art. 404 provides in part:
A. Character evidence generally. Evidence of a person's character or a trait of *942 his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
(2) Character of victim. (a) [E]vidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible.
The methods of proving character are set forth in La. C.E. art. 405, which provides in part:
A. Reputation. [I]n all cases in which evidence of character or a trait of character is admissible, proof may be made by testimony as to general reputation only....
C. Foundation. Before a person may be permitted to testify to the reputation of another person, a foundation must be established that the witness is familiar with that reputation.
As a condition of admissibility, defendant must first produce evidence that at the time of the incident, the victim made a hostile demonstration or committed an overt act against defendant. Once evidence of an overt act or hostile demonstration is established, evidence of threats and the victim's character is admissible for two distinct purposes: to show defendant's reasonable apprehension of danger which would justify his conduct and to help determine who was the aggressor in the conflict. State v. Edwards, supra; State v. Hardeman, 467 So.2d 1163 (La.App. 2d Cir.1985).
Our review of the record reflects that even without the testimony of Det. Sorrells, defendant was able to present evidence of the victim's previous incarceration and other crimes for which he was arrested or convicted and that McDowell was known to carry a box cutter. Furthermore, only one witness, Dennis George, testified that he saw McDowell advance toward defendant, "but that's when Quincy (defendant) backed up." We note also that George testified after the testimony of Det. Sorrells. Prior to George's testimony, there had been no evidence of any overt acts by McDowell which would justify the introduction of the alleged character evidence.
Even without the proper foundation, on cross-examination of the state's witnesses, defense counsel was able to elicit testimony that McDowell was a known felon with convictions for rape, cruelty to a juvenile and aggravated battery. Further, defendant's attorney was able to establish that some persons knew that McDowell carried a box cutter. This assignment of error is without merit.

Excessiveness of Sentence
Defendant argues that his mandatory life sentence is excessive.[3]
Excessive punishment is proscribed by both the United States and Louisiana Constitutions. U.S. Const. Amendment 8; La. Const. art. I, § 20. A sentence is excessive if it is grossly out of proportion to the seriousness of the offense or is nothing more than a needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La. 1993); State v. Bonanno, 384 So.2d 355 (La. 1980).
We have reviewed the circumstances of this case and do not find defendant's mandatory sentence to be shocking to our sense of justice. See also State v. Bryant, 29,344 (La.App. 2d Cir.05/07/97), 694 So.2d 556. This assignment of error is without merit.

Error Patent
During sentencing, the trial court informed defendant of the three year prescriptive period for post-conviction relief, but failed to advise defendant that this period begins to run when the judgment becomes final under La.C.Cr.P. art. 914 or 922. This defect has no bearing on the sentence and is not grounds for reversal or remand. La.C.Cr.P. arts. 921, 930.8; State v. Mock, 602 So.2d 776 (La.App. 2d Cir.1992). The trial court is directed to send appropriate written notice to defendant within ten days of the rendition *943 of this opinion and to file proof of defendant's receipt of such notice in the record.
Finally, defendant argues that the trial court failed to charge the jury that the state had the burden of proving that defendant did not act in self-defense. Defendant concedes, however, that his attorney did not object to the trial court's failure to include such an instruction.
The record reveals that defendant did not request any special jury instructions and that the trial court charged the jury without objection from either defense counsel or the state's attorney. Having failed to object timely, defendant is precluded from asserting error on appeal. La.C.Cr.P. arts. 801, 841(A). Nonetheless, defendant urges that this is an error patent as it is clearly discoverable on the face of the record.
We disagree. Louisiana has rejected a general "plain error" rule. It is only in limited circumstances that an alleged error in charging the jury may be reviewed absent a contemporaneous objection. State v. Arvie, 505 So.2d 44 (La.1987); State v. Thomas, 27,507 (La.App. 2d Cir.12/06/95), 665 So.2d 629, writ denied, 96-0119 (La.04/08/96), 671 So.2d 333. See also State v. Dunn, 548 So.2d 95 (La.App. 4th Cir.1989), writ denied, 556 So.2d 55 (La.1990), in which the Fourth Circuit held that the failure to give a jury charge regarding the state's burden of proof was not reviewable absent an objection by defendant at the time of the trial court's failure to include such an instruction.

Conclusion
For the reasons set forth above, defendant's conviction and sentence are AFFIRMED.
NOTES
[1] Defendant's name is also spelled "Quincy" several times throughout the record.
[2] Because an objection was raised as to their use, the pamphlets should have been filed in the record for appellate purposes; however, we note that this was the responsibility of defense counsel.
[3] We note that defendant did not file a motion to reconsider sentence as required by La.C.Cr.P. art. 881.1. Nonetheless, we will review his sentence for constitutional excessiveness.