781 So.2d 853 (2001)
STATE of Louisiana, Appellee,
v.
Jemetric DEBROW, Lakeith Debrow and Clifford Owens, Appellants.
No. 34,161-KA.
Court of Appeal of Louisiana, Second Circuit.
March 2, 2001.
*856 Louisiana Appellate Project by Carey J. Ellis, III, Rayville, LA, Counsel for Appellant Jemetric Debrow.
Peter J. Black, Shreveport, LA, Counsel for Appellant Lakeith Debrow.
Louisiana Appellate Project by Peggy J. Sullivan, Monroe, LA, Counsel for Appellant Clifford Owens.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Catherine M. Estopinal, Assistant District Attorney, Edwin J. Blewer, III, Assistant District Attorney, Counsel for Appellee.
Before NORRIS, KOSTELKA and DREW, JJ.
DREW, J.
Jemetric Debrow, Lakeith Debrow and Clifford Owens were convicted as charged of armed robbery and attempted second degree murder of John Sponsel. Jemetric Debrow was adjudicated a second felony offender as to the armed robbery and was sentenced to 60 years at hard labor, to run concurrently with a sentence of 40 years at hard labor for the attempted second degree murder, both without benefit. Lakeith Debrow was adjudicated a third felony offender as to the attempted second degree murder and was sentenced to life imprisonment, to run concurrently with 60 years at hard labor for the armed robbery, both without benefit. Clifford Owens was adjudicated a second felony offender as to the armed robbery and was sentenced to 60 years at hard labor, to run concurrently with 40 years at hard labor for the attempted second degree murder, both without benefit.
They each appeal their convictions and sentences. We affirm in all respects.

FACTS

Robbery and Shooting
John Sponsel lived in Greenway Square Apartments on Youree Drive in Shreveport. At 9:30 in the evening on January 28, 1997, Sponsel heard a knock at his apartment door. Unable to see anyone through the door's peephole, Sponsel opened the door. Standing in his doorway were three black males later identified by *857 Sponsel as Jemetric Debrow, Lakeith Debrow and Clifford Owens. A black .25 caliber handgun was immediately placed to Sponsel's head by one defendant; the trigger was pulled but the gun did not fire. The other two defendants were armed with "western-style" .22 pistols. All three wore tube socks on their hands. Jemetric Debrow, Lakeith Debrow and Clifford Owens entered Sponsel's apartment and ordered him to lie face-down on his kitchen floor. They asked where his money and drugs were. One defendant stood guard over Sponsel in the kitchen while the others removed his possessions from the apartment. Among the items taken were a VCR, jacket, face-plate to a car stereo, meat from the freezer and $400.00.
The defendants were in Sponsel's apartment for 15-20 minutes. When Sponsel heard one of the defendants make a statement indicating he was going to be killed, Sponsel tried to escape. Sponsel, who had played center for several local semi-pro football teams, jumped up and rushed the defendant who was guarding him, pushed this defendant to the side and ran towards the front door. As Sponsel reached the front door of the apartment, he was shot in the back twice. Sponsel fell in the door's threshold due to his wounds. As the defendants exited the apartment, Sponsel was shot once in the head. Sponsel was unable to identify at trial which of the defendants fired the shots. The defendants fled the apartment complex in Sponsel's blue Ford Escort, having taken the keys from his apartment.
Michael Luraschi, Sponsel's neighbor, heard popping sounds and then someone crying for help. He opened his door to discover Sponsel on the ground, lying partially out of his apartment. Sponsel said that he had been robbed and shot. Luraschi called 911. Sponsel was eventually transported to LSU Medical Center ("LSUMC").

Investigation
Shreveport Police Department ("SPD") Officers Blackman and Miller were among the first officers to arrive at the shooting scene. Sponsel was found on his back in the doorway, with his head outside and his feet inside. Miller reported to a later arriving detective that he was told by Sponsel that the three black males who had entered his apartment were wearing masks. Blackman also reported to a detective that he was told by EMTs that Sponsel told them he was shot while going into his apartment.
Detective Ronnie Gryder from the SPD's Homicide/Robbery Unit investigated the shooting. He described Sponsel's apartment as ransacked. Gryder noticed where a bullet had ricocheted from the wall of a breezeway outside of Sponsel's apartment up into the breezeway's ceiling. He thought the bullet had been fired from the apartment. Gryder went to LSUMC within 90 minutes of the shooting in an attempt to interview Sponsel, but was told by hospital personnel that he could not speak to Sponsel at that time. Gryder returned to LSUMC at 1:50 a.m. on January 29, a little over four hours after the shooting. Sponsel told Gryder that he was shot from behind as he approached the front door in his effort to escape, and then was shot in the head as the defendants left. Sponsel also told Gryder that one person shot him and that he was first shot while in the kitchen. Gryder did not find blood or shell casings inside Sponsel's apartment. Sponsel was able to give a description of only one suspect.
Detective Carolyn Eaves is an investigator with SPD's Homicide and Robbery unit. At 11:40 p.m. on the night of the shooting, Eaves received a report that Sponsel's Ford Escort had been found *858 burning in the 1900 block of Walnut Street. The chrome rims, tires, wheels and stereo had been removed. Marlon Hanna, a friend of the three defendants, lived a short distance away from where the vehicle was found.
SPD Officer Danny Duddy was assigned to the Crime Scene Investigation Unit. He found blood on the ground and on a wall in front of Sponsel's apartment. He did not find any blood inside the apartment. Duddy lifted some partial fingerprints from the inside of the door frame, but these prints were unidentifiable. He agreed on the stand that wearing socks over hands would prevent fingerprints from being left.
Detective Cedric Wilson, an investigator with SPD, received a phone call from an anonymous caller on January 29. The caller said that Cedric Owens and individuals with the nicknames Keke and Meme were involved in Sponsel's shooting. Wilson checked the alias files and came up with the names of Jerry Wilson under "Keke" and Jemetric Debrow under "Meme". Jemetric Debrow's address of 2815 Frederick St. was consistent with information the caller had given.
Three photographic lineups were prepared and brought to Sponsel on the evening of January 30. Sponsel was in ICU at the time. Sponsel, who was lying on his back, was unable to sit up, turn his head or hold the lineups. Each lineup, which contained six photos, was held by Gryder directly above Sponsel's face. Sponsel picked Jemetric Debrow out of the first lineup. Gryder remembered Sponsel saying that Jemetric Debrow was the one who shot him in the head. However, Wilson recalled Sponsel saying Jemetric Debrow was the person who held the .25 to his head when he opened the door. The gunman had pulled the trigger at that point, but the gun had not fired. Sponsel could not identify anyone in the second lineup, which contained Jerry Wilson's photo. When shown the third lineup, Sponsel picked out Clifford Owens's photo. Gryder recalled that Sponsel responded that Clifford Owens was the one who shot him in the back. Wilson testified that Sponsel said Clifford Owens shot him in the back while he was trying to get away. Because Sponsel was unable to sign the rear of the photos, Wilson signed on his behalf with his permission. Arrest warrants for Clifford Owens and Jemetric Debrow were obtained. Search warrants for 2815 Frederick St. and an apartment in Sponsel's complex occupied by Owens's sister were also obtained.
Warrants were served at the Frederick St. address on the morning of February 1, 1997. SPD Detective James Sorrells gathered the evidence and filled out the search warrant return. Detective Wilson found Lakeith Debrow asleep in a bedroom in the northeast corner of the house. When Wilson asked Lakeith Debrow if he had a nickname, he said his nickname was Keke.
Wilson and Sorrells searched Jemetric Debrow's bedroom, which was in the southeast corner of the house. In this room they found a small, black Titan .25 semi-automatic pistol inside a stereo speaker, a RG short-barrel .22 pistol under a pile of clothes and a New Frontier western-style.22 pistol with a longer barrel underneath the carpet. Also discovered in the room were Jemetric's ID card and several Polaroid photos showing Clifford Owens, Jemetric Debrow, Lakeith Debrow and Marlon Hanna together.
SPD Officer Anthony Adams searched Lakeith's bedroom. He discovered a long-barrel Ruger .22 pistol and a RG .38 pistol in the headboard of a bed. Both guns were black with brown handles. Officer Duddy was unable to recover any usable fingerprints from the firearms seized at the Frederick St. home. No evidence was *859 recovered at the apartment of Clifford Owens's sister, where Owens occasionally stayed. None of the items taken from inside Sponsel's apartment were ever recovered.
A fourth lineup, also containing six photos, was brought to Sponsel by Detective Sorrells on the night of February 1. Sponsel immediately pointed to Lakeith Debrow's photo and said that was the person who shot him. Sponsel was able to sign the rear of the photo this time.
Detective Eaves and Officer Duddy returned to Sponsel's apartment on February 4 in order to remove a projectile from the ceiling outside his apartment. The bullet was sent first to the North Louisiana Crime Lab and then to the FBI Crime Lab, but the results were inconclusive as to whether the bullet had been fired from one of the seized weapons. Detective Eaves thought the projectile was from a small caliber weapon.
On February 5, Owens, wishing to turn himself in, called Wilson from Oakland, California. The next day, Eaves and Wilson flew to Oakland to extradite Owens, who had surrendered to authorities there.

Medical Treatment
Dr. Richard Polin, a neurosurgeon, treated Sponsel for the residual effects of his gunshot wounds. Two bullets had penetrated Sponsel's nervous system. One bullet entered the left temporal lobe of the brain before fragmenting, resulting in damage to the bones and brain at the base of the skull. A second bullet entered the body in mid-back and damaged the spinal cord at the fifth thoracic level. Sponsel was unable to move his legs well at first because the bullet fragments stayed in the body. Dr. Polin opined that the weapons used were low caliber. Dr. Polin reviewed Sponsel's records when he was admitted to LSUMC after the shooting. Sponsel's drug screen upon admission was negative for alcohol and drugs. Sponsel was prescribed Percocet as a pain medication. Dr. Polin described Percocet as a lowpotency narcotic that does not cause mental disorientation or confusion. Sponsel's orientation as to time and place was regularly tested while he was at LSUMC, and he was questioned about his personal information. Sponsel was discharged to rehabilitation. In February of 1998, spinal fluid began leaking from his nose. A cranial procedure was performed; however, it was unsuccessful and this procedure was repeated. Sponsel continued to suffer from double vision in his right eye. Dr. Polin also testified that difficulty with concentration and patchy memory are typical results of an injury to the left temporal lobe.

DISCUSSION

Sufficiency of Evidence
Each defendant argues that there was insufficient evidence to support his conviction for armed robbery and attempted second degree murder. Their motions for post-verdict judgment of acquittal were denied.
When the defendant challenges both the sufficiency of the evidence and other trial errors, the reviewing court first determines the sufficiency issue, as the defendant may be entitled to acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably find every element of the offense proven beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.), writ denied, 605 So.2d 1089 (La.1992).
*860 The Jackson due process standard of review does not permit an appellate court to substitute its appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. An appellate court does not assess credibility or reweigh the evidence. State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132.
A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, 29,253 (La. App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333; State v. Rogers, 494 So.2d 1251 (La. App. 2d Cir.1986), writ denied, 499 So.2d 83 (La.1987). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Bellamy, supra.
Defendants assert that several inconsistencies in John Sponsel's statements to police and his testimony make it impossible for the state to have met its burden of proof in this case. Officer Miller reported to Detective Gryder that Sponsel stated the robbers wore masks. Sponsel denied at trial that the three men who robbed and shot him were wearing masks. Sponsel could not recall talking to the police at his apartment. Sponsel never mentioned the masks during any subsequent interviews by police. In addition, this statement to Miller would have been made soon after the shooting when Sponsel was awaiting medical transport.
Defendants next focus on inconsistent statements Sponsel made to police about exactly who shot him. When Sponsel picked Jemetric Debrow's photo out of the lineup, Detective Gryder recalled that Sponsel said Jemetric Debrow was the one who shot him in the head. Detective Wilson remembers it differently, recalling that Sponsel said Jemetric Debrow held the gun to his head when he opened the door. We note that Sponsel testified that a gun was placed to his head when he opened the door, the trigger was pulled, but the gun jammed. Upon picking out Clifford Owens's photo, Sponsel told the officers that Clifford Owens was the one who shot him in the back. When shown the fourth lineup several days later, Sponsel immediately pointed to Lakeith Debrow's photo and said that that was the person who shot him. Sponsel had earlier told police that one person shot him.
Dr. Polin testified that patchy memory loss would be a result of the damage done to Sponsel's brain by the bullet. When stating that a particular defendant shot him, Sponsel may have been referring to each defendant as being part of a unit which collectively robbed and shot him. In addition, Sponsel was unable to testify at trial exactly which defendant(s) shot him because his back was turned to the shooter(s). Nonetheless, Sponsel was able to positively identify Jemetric Debrow, Lakeith Debrow and Clifford Owens during the lineups and at trial as the three men who forced their way into his apartment, ransacked his apartment, held him at gunpoint and shot him when he tried to escape and as they fled his apartment. Sponsel was familiar with Clifford Owens, having previously seen him in the apartment complex on several occasions as Owens would sometimes stay with his sister who lived in Sponsel's complex.
Any distinction between whether Sponsel told the police he was shot in the kitchen or while heading to the door is of no consequence as the kitchen opened into a small area where the door was located; thus, Sponsel could have still been in the kitchen at the same time he was heading for the door. Sponsel was able to identify *861 the Ruger .22, New Frontier .22 and Titan.25, which were seized during the search of the Frederick St. residence, as being identical to the guns used by the defendants during the crime. Introduced into evidence was a photo of the three defendants holding guns. There was a stipulation that the guns in the photo appeared to be some of the guns seized at the residence. Their acquaintance, Marlon Hanna, is also in these photos. Sponsel's car was found burning in an area near Hanna's home.
The defendants presented an alibi defense of the Debrows' mother, grandmother and cousin testifying that there was a party at the Frederick St. residence on the night of the shooting, and that the defendants were all present at the party at the time of the shooting. The jury obviously rejected this alibi defense and accepted Sponsel's assertions that the three defendants robbed and shot him.
Viewing the evidence in the light most favorable to the prosecution, we conclude that the jury could have reasonably found the essential elements of the crimes proven beyond a reasonable doubt. This assignment of error is without merit.

Excessive Sentence
The defendants next argue that the sentences imposed were constitutionally excessive. Their motions to reconsider sentence were denied.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Dunn, 30,767 (La.App.2d Cir.6/24/98), 715 So.2d 641. The articulation of the factual basis for a sentence is the goal of La. C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864; State v. Hudgins, 519 So.2d 400 (La.App. 2d Cir.1988), writ denied, 521 So.2d 1143 (La.1988).
There is no requirement that specific matters be given any particular weight at sentencing. State v. Jones, 33,111 (La.App.2d Cir.3/1/00), 754 So.2d 392; State v. Callahan, 29,351 (La.App.2d Cir.2/26/97), 690 So.2d 864, writ denied, 97-0705 (La.9/26/97), 701 So.2d 979. The record adequately indicates the trial court was aware of the matters urged by the defense prior to imposing sentence.
Whether the sentence imposed is too severe depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const. art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Bradford, supra.
*862 A trial court has wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of that discretion, we will not set aside a sentence as excessive. State v. Square, 433 So.2d 104 (La.1983); State v. Washington, 29,478 (La.App.2d Cir.4/2/97), 691 So.2d 345.
At the time this offense was committed, the sentence for conviction of armed robbery was imprisonment at hard labor for not less than 5 years and for not more than 99 years without benefit. La. R.S. 14:64. A person found guilty of attempted second degree murder shall be imprisoned for not less than 10 years but not more than 50 years at hard labor and without benefit. The habitual offender law for armed robbery requires that a defendant be sentenced to a term of not less than 49½ years to not more than 198 years, all at hard labor and without benefit. A second felony offender shall be sentenced for a term not less than one-half of the longest term and not more than twice the longest term prescribed for a first conviction. La. R.S. 15:529.1(A)(1)(a). If the third felony or either of the two prior felonies is a felony defined as a crime of violence under La. R.S. 14:2(13), such as attempted second degree murder, the defendant shall be imprisoned for life without benefit. La. R.S. 15:529.1(A)(1)(b)(ii).
The trial court ordered pre-sentence investigations for each defendant. For Lakeith Debrow that investigation revealed a juvenile record and two prior felonies. The trial court found that Jemetric Debrow was a second felony offender whose parole had been revoked when arrested for this robbery and shooting, and who had a juvenile record. Clifford Owens also had a juvenile record and was a second felony offender who had been involved in gang activity.
The three defendants used weapons to gain entry into Sponsel's apartment, ransacked his apartment, removed several items and shot Sponsel numerous times, leaving him to die. Each sentence is within the statutory limits. On this record, we cannot conclude that any of these sentences is a purposeless or needless infliction of pain or suffering, or shocking to the sense of justice. The sentences are affirmed.

Bench Conferences
Lakeith Debrow urges that the trial court erred in conducting side bar conferences without his presence. Citing La.C.Cr.P. art. 831(4), he contends that several bench conferences resulted in unexplained rulings on objections. La. C.Cr.P art. 831 provides, in part:
A. Except as may be provided by local rules of court in accordance with Articles 522 and 551, a defendant charged with a felony shall be present:
* * * * *
(4) At all times during the trial when the court is determining and ruling on the admissibility of evidence[.]
* * * * *
In State v. Wesley, 33,402 (La. App.2d Cir.5/10/00), 759 So.2d 286, this court held that a defendant's absence from bench conferences regarding housekeeping matters or ministerial functions of the trial court did not run afoul of Article 831. The record does not reflect any objection by Lakeith Debrow to the bench conferences he now protests. The right to be present may be waived by the defendant's failure to assert an objection to a discussion held in his absence. State v. Strickland, 94-0025 (La.11/1/96), 683 So.2d 218. Moreover, there is no jurisprudence or specific statutory provision requiring the defendant's presence at a bench conference in order to satisfy the requirement of La. C.Cr.P. art. 831. State v. Wesley, supra; State v. Glover, 93-959 (La.App. 5th *863 Cir.3/29/94), 636 So.2d 976, writ denied, 94-1460 (La.9/3/96), 678 So.2d 544, writ granted in part and remanded, 97-1474 (La.12/19/97), 704 So.2d 242. Accordingly, this assignment of error is without merit.

Opinion Testimony
Lakeith Debrow further argues that the trial court erred in allowing the state to elicit opinion testimony concerning the crime scene and Sponsel's statements to the police. Specifically, he objects to the trial court allowing: (i) Detective Gryder to testify that victims of violent crime often give inconsistent statements to police immediately after the incident; (ii) Gryder to testify that he didn't believe Sponsel knew his assailants; (iii) Gryder to give his opinion about whether he believed Sponsel recognized his assailants when shown the lineups; (iv) Gryder to testify that the bullet damage to the wall and ceiling was consistent with a gun having been fired from inside the apartment; and (v) Detective Wilson to testify that an anonymous caller purposely providing erroneous information would be more likely to give full names rather than nicknames.
A law enforcement officer may testify as to matters within his personal knowledge acquired through experience without being qualified as an expert witness. State v. Harvey, 26,613 (La.App.2d Cir.1/25/95), 649 So.2d 783, writs denied, 95-0430 (La.6/30/95), 657 So.2d 1026 and 95-0625 (La.6/30/95), 657 So.2d 1026, 1028; State v. Lowery, 609 So.2d 1125 (La.App. 2d Cir.1992), writ denied, 617 So.2d 905 (La.1993). Also, a lay witness may testify based upon a natural inference from observed facts. State v. Hicks, 607 So.2d 937 (La.App. 2d Cir.1992). In such an instance, the witness should state the observed facts upon which the inference was based.
The testimony given by Detectives Gryder and Wilson was given in direct response to the defendants' attempts to attack the credibility of their testimony. Furthermore, their testimony was given based on their experience as law enforcement officers. The trial court did not err in allowing this testimony.

Photos
Lakeith Debrow contends in his final assignment of error that the trial court erred in allowing two photographs into evidence. These photographs showed Clifford Owens, Jemetric Debrow, Lakeith Debrow and Marlon Hanna together. In one photo, the three defendants are aiming firearms at their heads. In both photos, some of the defendants and Hanna are flashing gang signs. Lakeith Debrow argues that the prejudicial effect of these photos outweighed their probative value.
Photographs are generally admissible if they illustrate any fact, shed any light upon an issue in the case, or are relevant to describe the person, thing or place depicted. State v. Washington, 30,866 (La.App.2d Cir.8/19/98), 716 So.2d 936, writ denied, 98-2473 (La.1/8/99), 734 So.2d 1229; State v. Jackson, 30,473 (La.App.2d Cir.5/13/98), 714 So.2d 87, writ denied, 98-1778 (La.11/6/98), 727 So.2d 444. The cumulative nature of photographic evidence does not render it inadmissible if it corroborates the testimony of witnesses on essential matters. State v. Langley, 95-1489 (La.4/14/98), 711 So.2d 651. The admission of photographs is not reversible error unless it is clear that their probative value is substantially outweighed by their prejudicial effect. State v. Washington, supra.
We disagree with Lakeith's contentions. The photos conclusively established that the Debrow brothers associated with Clifford Owens. Marlon Hanna, who lived near where Sponsel's burned car was found, is also shown in the photos. There was a stipulation that the guns shown in the photos appeared to be some of the *864 same guns seized at the Debrow residence. Sponsel identified several of the guns seized at the house as being identical to the guns used by the defendants during the crime. Therefore, these photos have the strong probative value of showing the defendants holding the actual guns seized at the home.
We note that it was the defense which raised the issue of gang signs or any supposed inflammatory nature of the photos before the jury. During closing arguments, trial counsel for Clifford Owens told the jury:
Now, as to whether or not those things that were confiscated at 2815 Frederick, yes, they'rethey're highly inflammatory. If I show you a picture of an individual flashing a gang sign, that doesn't mean he committed a crime near LSU-S...
Our emphasis.
Also during closing argument, trial counsel for Jemetric Debrow stated:
The Polaroids. I'm sure all of you were very anxious to see these Polaroids, because we were trying hard for you not to see them. They're not relevant. Why did the State show them to you? Because that's all he has. He wants to inflame you. Do those Polaroids prove that any of these individuals, let alone all three of them, were at 9050 Youree Drive or that those weapons were at 9050 Youree Drive. They prove nothing to you. They were shown to you to appeal to your senses and to inflame you, to get you off the path of guilt or innocence. Nothing that you've seen proves that these men committed these crimes. Nothing.
Our emphasis.
Finally, trial counsel for Lakeith Debrow stated during closing argument:
The photographs that we stipulated to, prior to him showing you those photographs, there was testimony that there were photographs in the house. Four people were in those photographs. Here's who those four people were. Those four people have guns in their hands; okay. They're similar to the guns usedor the guns found, rather, in the house. That's what their testimony is. I can argue that testimony to you. Sure, I just did.
Why do I need a picture? Well, gee. Well, I don't know. Do you think it will make you mad? Do you think it will get you into kind of a lynch kind of mob kind of deal going here? Damn the facts, full speed ahead to guilty? Maybe.
Emphasis added.
We cannot conclude that the probative value of these two photographs is outweighed by any prejudicial effect highlighted by defense counsel. The photographs were properly admitted into evidence. This assignment of error is also without merit.

DECREE
The convictions and sentences are AFFIRMED.