377 So.2d 58 (1979)
STATE of Louisiana
v.
Leroy STERLING.
No. 64221.
Supreme Court of Louisiana.
November 1, 1979.
Rehearing Denied December 13, 1979.
*59 George H. Ware, Jr., Clinton, Michael Hughes, St. Francisville, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Patrick G. Quinlan, Asst. Attys. Gen., for plaintiff-appellee.
SUMMERS, Chief Justice.
The Grand Jury of West Feliciana Parish indicted Leroy Sterling for the September 7, 1968 murder of Taylor J. Labry, Jr., a violation of Article 30 of the Criminal Code. He was convicted and sentenced to life imprisonment at hard labor.
Taylor Labry was the owner and operator of a general store in Bain, Louisiana. On Saturday evening, September 7, 1968, Labry closed the store for the day, locking the doors as he departed. He drove off in his car with defendant's father, an occasional employee of the store, and one of defendant's sisters, intending to give them a ride to their house. Labry dropped them off at their house, turned around and headed home. He never arrived.
Defendant had met earlier that day with Louis Hall and Jessie James Washington at which time they planned to rob Labry that night. Defendant had also worked for Labry in the past and knew as others did that Labry placed his money in the trunk of his car when he closed his store each day. It was their scheme to block Labry's path with Washington's truck as Labry drove from the Sterling residence.
The trio spent the afternoon drinking in Labry's store, leaving shortly before closing to set their trap. As Labry emerged from the road leading to the Sterling house, defendant sped forward in Washington's truck in an attempt to block the way. Blinded by the headlights of Labry's car, he missed and drove off the road. However, *60 Hall and Washington leaped into Labry's car, clubbed him into unconsciousness and drove off with Washington at the wheel and defendant following in Washington's truck.
The trip ended in the woods off a back country road. Hall and Washington took the money sack out of the trunk of Labry's car and removed his wallet from his pocket. Labry's body was left sprawled in a ditch. Washington had clubbed him in the head with a piece of heavy timber, slashed his throat and shot him twice. As they left the scene, Washington threw the club next to the body and set fire to Labry's car.
Smoke from the burning automobile led the police to the victim's body the next day (Saturday). By Monday they had arrested defendant. On Wednesday defendant confessed, giving a full account of the robbery and killing of Labry.
Washington and Hall were convicted, and their convictions were affirmed in this court in 1970. Each was sentenced to death. State v. Washington, 256 La. 233, 236 So.2d 23 (1970) and State v. Hall, 256 La. 336, 236 So.2d 489 (1970). Later, following Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), their death sentences were set aside and they were sentenced to life imprisonment. State v. Washington, 261 La. 808, 261 So.2d 224 (1972).
Although six assignments of error were reserved, only four are urged on this appeal. Assignments of error not argued or briefed are by law considered abandoned. This opinion is therefore confined to the four assignments of error briefed and argued on appeal, using the number designations adopted by defendant.
Assignment 3: Defendant contends error was committed when the trial judge admitted a photograph of the slain victim into evidence over objection. It is argued that the photograph, which depicts the body of the victim lying in weeds alongside a 6" by 6" wooden timber about four feet long, his face smeared with blood, was gruesome and inflammatory. Its probative value, it is asserted, was vastly outweighed by its prejudicial effect. This was especially true, according to the defense, because all relevant facts which the photograph had been introduced to prove had been admitted.
Before the photograph was admitted defense counsel offered to stipulate that the body shown in the photograph was that of Labry and that his death was violent in nature, more likely than not caused by blows from a blunt instrument and/or a firearm.
Generally, this Court has held that photographs of the body of the victim depicting fatal wounds are relevant to prove the corpus delicti; to corroborate other evidence of the manner in which death occurred; to establish the location, severity, and number of wounds; and to establish the identity of the victim. State v. Cooper, 334 So.2d 211 (La.1976). See, also State v. Beach, 320 So.2d 142 (La.1975) and State v. Hall, 256 La. 336, 236 So.2d 489 (La.1970).
The ultimate test to be applied before a gruesome photograph can be admitted is whether its probative value outweighs its probable inflammatory effect. The evidence, of course, must also be relevant for some purpose. And a balance must be struck between the photograph's probative value and its tendency to overwhelm reason and associate the accused with the atrocity without other sufficient proof. State v. Kelly, 362 So.2d 1071 (La. 1978); State v. Smith, 327 So.2d 355 (La. 1976).
A defense stipulation to the fact and cause of death necessarily bears upon balancing probative value against prejudicial impact. State v. Gilmore, 332 So.2d 789 (La.1976). But the decision remains one for the court. State v. Kelly, supra.
No error is found in this record when the facts are considered in the light of these principles. The photograph is not so gruesome that its probable effect outweighs its probative value. It is black and white, and was taken at a distance which does not exaggerate the wounds. The entire body is in view and is mostly clothed; the scene is exactly as it was when discovered by the *61 police. It corroborates defendant's confession insofar as the place of the murder and how it occurred. From the photograph it is evident that the killers had specific intent to kill. Thus it supports the State's apparent reliance on specific intent as opposed to felony murder.
This assignment lacks merit.
Assignment 4: At trial the State introduced defendant's confession, over objection. In the confession he set forth a chronology of the events leading to Labry's death. In doing so he referred to the robbery, theft, obstruction of the public highway, kidnapping, battery and the burning of the car, all of which were references to other crimes. Defense counsel objected to the introduction of the confession because it referred to other crimes not admissible according to Sections 445 and 446 of Title 15 of the Revised Statutes and were not part of the res gestae within the contemplation of Section 448 of Title 15. Furthermore, the defense invokes the limitation provisions of Article 572 of the Code of Criminal Procedure contending that reference to these other crimes is error because, due to the passage of time, defendant can no longer be prosecuted for their commission.
Reference to the sequence of events leading to the ultimate offense brought before the jury the details of one transaction. Each offense was closely related to the offense charged in time and place and they were, as the res gestae statute requires, "necessary incidents of the criminal act, or immediate concomitants of it, or form[ed] in conjunction with it one continuous transaction." La.Rev.Stat. 15:448. As we said in State v. Curry, 325 So.2d 598 (La.1976) "[w]ithout [such] evidence of the rape, the complete story of the crime could not be told." As part of the res gestae these other offenses were "always admissible in evidence." La.Rev.Stat. 15:447.
Where the charge is murder there is no time limitation upon the institution of prosecution for that crime. La.Code Crim. Pro. art. 571. And, where a necessary incident of the crime of murder is itself a crime and part of the res gestae, it is not a valid objection that the time for prosecuting the related offense has run. The reason for this is that a prosecution for murder has no limitation, and the statute of limitations does not apply to facts which are relevant and admissible to prove murder.
This assignment of error lacks merit.
Assignment 5: Travis Owen, Director of the Acadiana Criminalistic Laboratory in New Iberia testified for the State. He was accepted as an expert in criminalistics. Among other items Deputies Daniel and Richmond of the West Feliciana Sheriff's Office submitted a clear plastic bag containing clothing and another containing shoes marked "belonging to Louis Hall." Owen examined these clothes in the laboratory and determined that they were splattered with blood of human origin. At trial defense counsel objected because Owen had initially testified that he did not find that blood on the timber and soil samples obtained near the victim's body was human, and it was inconsistent for him to find that the blood on the clothes was human. It was then explained that Owen made no finding with respect to the timber and soil samples, nor that the blood there was not human.
In his brief to this Court, however, defense counsel urges that the information furnished to Owen to the effect that the clothes he examined belonged to the defendant Sterling was hearsay. And therefore his expert determination that the clothes contained human blood was inadmissible.
This contention disregards the previous testimony of Deputy Daniel who testified that he picked up the article of clothing referred to in Owen's testimony at defendant's residence and in defendant's presence, tagged it and transported it personally to the crime lab for examination and testing. While Owen's reference to the tag words "belonging to Leroy Sterling" was in fact hearsay, the ownership of the blood-splattered clothes had been adequately established by Daniel's uncontested testimony and a chain of custody was evident. Owen's testimony was at most cumulative *62 on this point and furnished no ground for reversal. As State v. Martin, 356 So.2d 1370 (La.1978) makes clear, "[o]ften an erroneous ruling admitting an unsworn out-of-court assertion by a testifying witness will not present grounds for reversal." That observation is manifestly appropriate here. La.Code Crim.Pro. art. 921.
There is no merit to this assignment.
Assignment 6: Prior to trial defendant filed a motion to suppress several inculpatory statements and confessions of defendant. It was alleged they were not obtained freely and voluntarily, because defendant was not advised of his constitutional rights in accordance with the decision of the United States Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Alternatively, it is alleged he confessed without having made a knowing and intelligent waiver of his constitutional rights.
At the hearing the trial judge denied the motion to suppress.
Because it presents the threshold issue on the question of the validity of the confession, the Miranda warnings will be considered first.

The Miranda Warnings
Labry's body was discovered by the authorities on Saturday night, the 7th of September 1968. An intensive investigation followed, resulting in defendant being detained on Monday September 9, 1968 for interrogation, at which time the following waiver of rights then in use by the arresting officers was read to him:
"You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer."
Later that night at the jail, after questioning, defendant was formally arrested. The arrest of Washington and Hall followed the next day.
On Wednesday, September 11, deputy sheriffs drove defendant to Baton Rouge where he submitted to a lie detector test, after again being advised of his Miranda rights with a recitation of the same words used when he was detained for interrogation the day before. Following the lie detector test that day defendant was interviewed by Colonel Fred Sliman of the East Baton Rouge Sheriff's Office, with Deputies Daniel and Pohlman present.
Colonel Sliman testified that defendant indicated that he wanted to talk to him and that Daniel and Pohlman left the room. Sliman then testified:
"Well, I first informed Leroy of his rights not as formally as in this written statement (referring to the statement contained in the confession). I told him of his right to remain silent; I told him about his right to have an attorney to consult with before answering any questions; I told him that he could have the attorney present with him during questioning; I told him that anything he says would be used against him in court. I told him if he couldn't afford an attorney one would be appointed for him and that he could have the appointed attorney present during questioning."
He also advised defendant, "That if he decided to answer questions at that time, he could stop at any point to consult an attorney or for any other reason he might have."
After Sliman discussed the matter generally with defendant, Deputies Daniel and Pohlman returned into the room. Defendant then gave Sliman a statement in the presence of the deputies, which Sliman reduced to writing in his own hand. The statement began with these words:
"May name is Leroy Sterling and I am a colored male 18 years old. I live at Hardwood, Louisiana. The statement I am giving is being made freely and voluntarily. *63 I have not been made any promises or offered any hope of immunity or reward to give this statement. I have been informed that anything I say will be used against me in court. I have been informed of my right to talk to a lawyer for advice before I answer any questions and to have a lawyer present when I answer questions, if I so desire. I have been told that if I want a lawyer's advice but cannot afford one, a lawyer will be appointed for me and that I can have that lawyer present during questioning if I so desire. I have been told also that if I decided to answer questions without an attorney present that I could stop answering questions at any time to get the advice of a lawyer or for any other reason I might have. I am making this statement with complete understanding of my rights as they were explained to me above and I have consented to answer questions without the presence or advice of a lawyer."
The statement continued with a detailed recitation of the events of the night of September 7 leading to the robbery and death of Labry.
Defendant was then returned to the jail house in St. Francisville. Then on September 13 defendant again signed a waiver of rights form in connection with his agreement to accompany law officers to the scene of the crime. This warning was the same as the one used when defendant was initially detained.
It is the defense contention that the Miranda warnings in use by the office of the sheriff did not adequately apprise defendant of his rights because of this language: "We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court."
Taken in isolation this language may instill doubt in the mind of the reader that defendant was fairly informed of his rights; that defendant may have gained the impression that a lawyer could not be furnished to him until he appeared in court. However, in the full context of the warning, coupled with the full and adequate warning he received from Colonel Sliman before giving the statement which was used against him at the trial, it cannot be logically concluded that defendant was not aware of his right to refuse to make any statement without the benefit of a lawyer. This was the result reached where an identical Miranda warning was under consideration by the Federal Fifth Circuit Court of Appeal in United States v. Lacy, 446 F.2d 511 (5th Cir. 1971). There the Court upheld the waiver form. In its view, when read as a whole, the waiver form told defendant "that (a) he had the right to the presence of an attorney and (b) that the right was to have an attorney `before he uttered a syllable.'" The court concluded "... [t]hat the attorney was not to be appointed until later seems immaterial since Lacy was informed that he had the right to put off answering any questions until the time when he did have an appointed attorney." Id. at 513.
A like result has been reached by the Fourth Circuit in Wright v. North Carolina, 483 F.2d 405 (4th Cir. 1973); the Second Circuit in Massimo v. United States, 463 F.2d 1171 (2d Cir. 1973), cert. denied, 409 U.S. 1117, 93 S.Ct. 920, 34 L.Ed.2d 700; the Eighth Circuit in Klingler v. United States, 409 F.2d 299 (8th Cir. 1969); and the Tenth Circuit in Coyote v. United States, 380 F.2d 305 (10th Cir. 1967), cert. denied, 389 U.S. 992, 88 S.Ct. 489, 19 L.Ed.2d 484.
On this record and the authorities cited, we are of the view that defendant was adequately informed of his rights as required by the Miranda decision.

Voluntariness of the Confession
Counsel for the defendant argues the voluntariness question, contending that an implied threat against defendant's sister in order to induce his confession arose from these facts: At the trial, out of the presence of the jury while the defense again urged its motion to suppress, defendant testified that while in the interrogation room he had a glimpse of his sister in the hallway through a crack in the door. "[The officers] *64 told me if I made a statement they would let her go.", he testified. The sister, Mary Sterling, confirmed that the police brought her to the station house on that day for "questioning." She explained: "I saw him on the way back from the fingerprint place, going back to the back where the jail was...." When the predicate was again being established before the jury, neither defendant nor his sister testified. Apparently the credibility of this testimony was unacceptable to the trial judge, for he again declined to suppress the confession. In addition, the three officers with defendant at the time emphatically denied any such threat or inducement. This assignment is therefore without merit.

Legality of Defendant's Arrest
Legality of his arrest and the ensuing taint on his confession is urged by defendant. "In all fairness to the law enforcement officers," the defense concedes, "they may have had some reason to pick defendant up for questioning, but it does not appear that there was any solid factual basis for his arrest."
The testimony of Sheriff Percy and Deputy Daniel at the suppression hearing were important to the State's case in support of the legitimacy of defendant's arrest and the probable cause required to sustain that legality. Their account of the investigation established that the police knew defendant's father had worked for Labry and that defendant "hung around there a good bit." Interviews with other patrons at the store on the day of the crime indicated that defendant, Hall, and Washington were "some of the last ones [in Labry's store] that night," and that "they were in Jessie James Washington's truck just before the thing happened."
At some point between Saturday, when Labry's body was discovered, and Monday, when defendant was arrested, the authorities talked to defendant. He indicated that he had spent Saturday night in Solitude, Louisiana. This claim could not be verified by the investigators. To the sheriff, this meant that the trio were without an alibi during the time the crime was committed.
Although there was no direct evidence connecting the trio with Labry's death and, of course, no eyewitness accounts of the incident, the sheriff's office did have a tire track, a footprint, and a report from someone that he heard a truck out in the woods at about the time of Labry's death. The sheriff suspected that the trio had tried to stop Labry as he came out of the drive leading from the Sterling residence. He found prints of "ground grip tires" there to support this deduction for he knew Washington's pick-up truck had such tires. And the footprints he found there looked like Washington's, which the sheriff recalled were long and narrow.
Defendant's relationship with Labry was a crucial factor to the investigating officers. Defendant had, at times, worked in the store for Labry. In addition, the sheriff said they had information from "other people telling me that they [defendant and his cohorts] were the ones who did it."
The foregoing evidence at the suppression hearing, combined with the following testimony at the trial, established probable cause for the arrest. Mr. and Mrs. Cavalier, customers at Labry's that night, placed defendant with Hall and Washington in the store, as did defendant's father. While none of these witnesses could state that the three left together, Eugene Davis saw the trio later that night in a bar at Solitude, somewhere between 9 and 11 o'clock. Solitude is only three or four miles from Bains where Labry's store was located.
Arthur Stewart, who lived in the area where Labry's body was found testified that a light-colored pick-up truck with "three heads ... in it" passed him on the road coming out of the back-country lane between 8 and 9 o'clock that night. Later, at home, Stewart heard "a car [horn] blowing" until the battery ran down. The next day Stewart walked back in the woods and found the smoking remains of Labry's car.
*65 Thus Stewart's testimony placed a truck fitting the description of Washington's with three occupants near the scene of the murder about the time the killing took place.
As this Court pointed out in State v. Johnson, 363 So.2d 684 (La.1978), the authorities need not have direct knowledge of an accused's criminal complicity in order to make a lawful arrest. In that case the police considered defendant's known filial hatred for his mother (the victim), his irrational and joyful conduct at the report of her death, and his association with a homosexual consort, the probable trigger man in the affair, who had no motive other than to please defendant. From these facts the Court found probable cause for defendant's arrest. It was, the Court said,
"... an intellectual jump to say, at this point, that Johnson arranged for [his consort] to kill his mother. However, from what the police could see about the unnatural filial hatred and the irrational conduct of Johnson, and from the character of the male prostitute with whom he was living, we cannot say there was no probable cause to arrest Johnson for complicity in the murder of his mother."
The facts known to the police in the Johnson Case convinced this Court that a man of ordinary caution would be justified in believing Johnson was guilty of criminal complicity in the murder of his mother, the sine qua non of a lawful arrest. State v. Dunbar, 356 So.2d 956 (La.1978).
"`Probable cause exists when facts and circumstances within the arresting officer's knowledge and of which he has reasonable and trustworthy information are sufficient to justify a man of average caution in the belief that the person to be arrested has committed an offense.'" State v. Scott, 355 So.2d 231 (La.1977).
This record satisfies the Court that the officers had probable cause to arrest defendant. This being so no impermissible taint invalidated the confession, and there is no merit to this assignment of error.
For the reasons assigned, the conviction and sentence are affirmed.
TATE, J., concurs and assigns reasons.
CALOGERO, J., concurs.
DENNIS, J., dissents, being of the opinion that the arrest was unlawful and that the defendant was not advised correctly of his rights.
TATE, Justice (concurring).
The facts show there was good reason to question the accused about the Saturday murder, and a reasonable basis to suspect his involvement in it; but I doubt the majority's conclusion that there was probable cause to arrest him Monday.
Nevertheless, even if the Monday arrest was technically without probable cause, I do not believe that his Wednesday confession was the fruit of the arrest. If the arrest was illegal, thenconsidering the lapse of two days, the repeated Miranda warnings, the accused's voluntary submission to a polygraph test (only following unfavorable results in which did he confess), and the absence of any purposeful and flagrant official misconduct in securing his detention, the confession was not the product of any exploitation of the illegal arrest. See State v. Grogan, 373 So.2d 1300 (La.1979); Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).
I otherwise concur fully in the majority opinion.