728 So.2d 954 (1999)
STATE of Louisiana, Appellee,
v.
James Kevin JORDAN, Appellant.
No. 31,568-KA.
Court of Appeal of Louisiana, Second Circuit.
February 24, 1999.
*956 John M. Lawrence, Indigent Defender Board, Shreveport, Counsel for Appellant.
Richard Ieyoub, Attorney General, James M. Bullers, District Attorney, Whitley R. Graves, Assistant District Attorney, Counsel for Appellee.
Before NORRIS, STEWART and CARAWAY, JJ.
NORRIS, Chief Judge.
James Kevin Jordan was convicted of first degree murder, a violation of La. R.S. 14:30. The jury deadlocked during the penalty phase, so the court sentenced Jordan to life at hard labor, without benefit of parole, probation or suspension of sentence. Jordan now appeals, urging seven assignments of error. We affirm the conviction and sentence.

*957 Facts

On September 20, 1995, Bossier City Police Department (BCPD) Officer Kevin Humphrey was dispatched to the scene of a homicide at the home of Mr. Jimmy Hudson, Jr. When Officer Humphrey arrived, he found Hudson's body on the floor. Hudson had been stabbed repeatedly and strangled. The officer found a kitchen knife lying on the victim's driveway.
BCPD Detective Kenny Hamm located Hudson's personal phone directory and found that one of the pages had been torn. On that page was the name and phone number of the defendant, James Kevin Jordan.
Meanwhile, Hudson's mother located an empty box in Hudson's apartment which had contained a VCR she had given him. The VCR, however, was not found in the apartment. From the box police were able to identify the VCR's serial number. Also missing was Hudson's CD player. On September 22, the police learned that a CD player of the same brand as Hudson's had been located in a Shreveport pawn shop. At the pawn shop, police discovered that a man named Kyie Jackson had pawned the CD player.
Just before midnight on September 22, Detective Hamm contacted Jordan, and he agreed to come to BCPD headquarters for an interview. After being Mirandized, Jordan told Detective Hamm that he had been at Hudson's home on the evenings of Sunday, Monday and Tuesday, this last day being September 19. Detective Hamm became suspicious of Jordan based upon this interview but did not take him into custody.
Police subsequently interviewed Jackson, who said that Huey Wilson had given him the CD player on Tuesday night or early Wednesday morning in exchange for two rocks of crack cocaine. Police contacted Wilson who told them that Jordan had given him the CD player to exchange for crack.
As a result of this information, Detective Hamm re-interviewed Jordan on September 25. Detective Hamm read Jordan his Miranda rights and he agreed to make a statement. Jordan stated that he knew Hudson and that they were "just friends." Jordan said that he was bisexual, but celibate, and that Hudson was gay. He did admit that he and Hudson might have engaged in oral sex early in their relationship but denied that they were lovers. Jordan told the officer that he had spent Sunday and Monday nights at Hudson's apartment and that he had been at the apartment on Tuesday night from about 7 p.m. until about 11 p.m. drinking whiskey. Jordan admitted to smoking crack cocaine all during this period and said that Hudson had given him some generic Soma, or muscle relaxant. He said that when he left Hudson's house Tuesday night he went to visit Wilson where he sold the tires from his car to buy more crack cocaine. Jordan denied taking anything from Hudson's home or killing Hudson and said that he did not know who did.
When Jordan finished his statement, Detective Hamm told him that he knew it was a lie, and Jordan then admitted that he was lying. Jordan then immediately made a second statement. Detective Hamm told Jordan that he wanted him to understand his rights, and Jordan said that he understood them. Jordan then said that while he was at Hudson's house on Tuesday night, he decided to steal the VCR and CD player to sell for money to buy crack. Jordan stated that he began to take the items when Hudson went to take a shower, but that Hudson had come out and caught him taking them. Jordan admitted to hitting Hudson with a crowbar and stated that they then wrestled, and he subsequently strangled Hudson. Jordan said that he then picked up a knife and stabbed Hudson in the chest repeatedly. Jordan admitted that he then stole the VCR and CD player, selling the CD player to someone named Huey for about $40 worth of crack.
Immediately after making the second statement, Jordan made a third brief statement describing where Hudson's body fell at the end of the struggle. Later that day, Jordan gave a fourth statement and claimed that Hudson had drugged him with the Soma without his knowledge.[1] Jordan again admitted *958 that he killed Hudson after Hudson caught him stealing the electronic items.
The next morning, Jordan spoke to Detective Hamm a fifth time. In this, his longest statement, Jordan reiterated his claim that Hudson drugged him with Soma and then stated that Hudson put some "white stuff' into his drink.[2] Jordan told Hamm that when he told Hudson that he was getting sleepy, Hudson began to make sexual advances toward him and tried to open his zipper. Jordan said that he refused Hudson's advances and that Hudson asked him to leave. Jordan stated that after he left, he had a flat tire and was forced to return to Hudson's apartment. At that point, Hudson admitted giving Jordan the Soma. Jordan said that this made him angry and led him to hit Hudson with the tire wrench. Jordan said that this led to a struggle and to his subsequent strangling and stabbing of Hudson. Jordan again admitted that he then took Hudson's electronics before leaving.
Jordan was indicted for first degree murder, and the state sought the death penalty. Jordan testified at trial and related a story similar to his fifth statement to police. He said that Hudson made persistent sexual advances toward him and at one point disrobed, climbed on top of him, and had unzipped Jordan's pants and pulled up his shirt. Jordan testified that Hudson eventually pinned him to the wall "trying to kiss me and ... trying to get into my pants again." Jordan said that he fought to get away and during that fight he picked up a crowbar and hit Hudson and then strangled him during the ensuing struggle. Jordan stated that he did not remember stabbing Hudson but did not deny that he did so or that he took the electronics. Jordan said that his first statements to Detective Hamm were untrue, that he "had been drinking gin all morning" before he made the statements and that Detective Hamm screamed at him when the tape was turned off.
The jury obviously did not believe Jordan's trial testimony and convicted him of first-degree murder. However, they could not agree on the imposition of the death penalty, so the court sentenced Jordan to serve life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. Jordan appeals the conviction and sentence, raising seven assignments of error.

Discussion

Assignment of Error # 7: Sufficiency of the evidence.
The issue of the sufficiency of the evidence is properly raised by a motion for post verdict judgment of acquittal under La. C.Cr.P. art. 821. Jordan failed to file this motion. However, such a motion is not necessary in order for this court to review an assignment of error challenging the sufficiency of the evidence. State v. Green, 28,994 (La.App.2d Cir.02/26/97), 691 So.2d 1273.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Brown, 29,708 (La.App.2d Cir.9/24/97), 702 So.2d 744, writ denied, 97-2549 (La.1/30/98), 709 So.2d 703.
In support of his contention that the evidence did not support the first degree murder verdict, Jordan argues (1) that his intoxication precluded him from having the specific intent to kill or to inflict great bodily harm and (2) that "the definition of manslaughter correctly identifies his conduct with respect to the homicide."
La. R.S. 14:30 provides that "[f]irst degree murder is the killing of a human being ... [w]hen the offender has specific intent to kill *959 or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... armed robbery, ... first degree robbery, or simple robbery."
The defense of intoxication is governed by La. R.S. 14:15:
The fact of an intoxicated or drugged condition of the offender at the time of the commission of the crime is immaterial, except,
(1) Where the production of the intoxicated or drugged condition has been involuntary, and the circumstances indicate this condition is the direct cause of the commission of the crime, the offender is exempt from criminal responsibility,
(2) Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime.
If the defendant proves that he was intoxicated at the time of the offense, the state has the burden of negating that defense by proof beyond a reasonable doubt. State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or part. State v. Toney, 26,711 (La.App.2d Cir.3/1/95), 651 So.2d 387.
Jordan testified that, at the time of the offense, he had been using crack cocaine for three days, he had recently consumed two mixed drinks, and that the victim had tricked him into taking at least four "Soma" muscle relaxant pills and put something into his drink. The state presented the testimony of Dr. George Seiden, a psychiatrist with board certifications in general and forensic psychiatry, on the issue of the effect of drugs on Jordan's behavior. Dr. Seiden testified that Soma has a mild tranquilizing effect in addition to its muscle relaxant properties and that "to the extent that tranquilizers occasionally can disinhibit it might slightly increase the livelihood [sic] of aggressive behavior. But there's not a whole lot of evidence that it has any significant effect on that." The doctor said that alcohol use could trigger a "blackout," or the inability to remember an event. Dr. Seiden testified that Soma could increase the effects of alcohol but noted that even in a blackout state a person can still know what he is doing and know that his actions are wrongful.
Doctor Seiden also said that the use of cocaine and alcohol together could form the compound cocaethylene which could produce a euphoric effect. Dr. George McCormick, Caddo Parish Coroner and a physician with a specialty in forensic pathology, testified that his office had recently completed a study of the correlation between aggressive behavior and the presence of cocaethylene in the body. Dr. McCormick testified that one theory suggested that this compound could make a person "violently, malignantly aggressive," but that his research found no correlation at all between cocaethylene and aggressive behavior.
Additionally, though claiming to be too intoxicated to be able to form the specific intent to kill, after killing Hudson, Jordan was able to disconnect the electronics, break back into Hudson's house for his keys, change a flat tire, drive to a nearby convenience store to talk to his mother, and drive to pick up Wilson to help him sell the equipment.
All of this evidence proved beyond a reasonable doubt that Jordan's drug use, voluntary or otherwise, neither caused him to commit this crime nor prevented him from having the specific intent to kill Hudson. Nothing in the expert testimony suggested that ingestion of two drinks, four muscle relaxants and the recent use of cocaine would cause a person to have an uncontrollable fit of murderous rage. Rather, the effects of the various mixtures of substances were described as producing states of either euphoria or drowsiness. Neither state, even if Jordan suffered a blackout, would have prevented him from forming the specific intent to kill or inflict great bodily harm upon the victim. Indeed, the physical evidence showing that the victim was both brutally strangled and viciously stabbed proves beyond a reasonable doubt that Jordan had the specific intent to kill Hudson.
*960 Jordan additionally argues that a verdict of manslaughter rather than first degree murder is more appropriate because the victim provoked the crime by drugging him and making unwanted sexual advances and because the state failed to prove an armed robbery. This court has the authority to modify the verdict if it finds that contention to be valid. La.C.Cr.P. art. 821 E.
Manslaughter is a homicide which would be either first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. La. R.S. 14:31 A(1).
"Sudden passion" or "heat of blood" immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection are not elements of the crime of manslaughter. They are mitigatory facts in the nature of a defense that exhibits a degree of culpability less than that present when homicide is committed without them. State v. Lewis, 28,973 (La. App.2d Cir.12/11/96), 685 So.2d 1130, writ denied, 97-0122 (La.5/16/97), 693 So.2d 797; State v. Lombard, 486 So.2d 106 (La.1986); see also State v. Peterson, 290 So.2d 307 (La.1974).
Therefore, a defendant who establishes by a preponderance of the evidence that he acted, with sufficient provocation, in sudden passion or heat of blood would be guilty of manslaughter. Lewis, supra; Lombard, supra. In reviewing a defendant's claim that he met that burden, the appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found that these mitigatory factors had not been established by a preponderance. Id.
Doctor McCormick described four "superficial" stab wounds in the victim's torso, the deepest of which measured one inch, and two such wounds to Hudson's face. He said that these wounds, likely made as Hudson was dying, were consistent with an angry or passionate attack, as between "lovers, spouses, significant others, family members," and testified that such wounds were typically inflicted either to dominate or to torture the victim. While these facts provide some evidence of sudden passion, the evidence does not show immediate provocation sufficient to deprive Jordan of self control and reduce his liability to manslaughter.
Dr. McCormick further observed four deep stab wounds in Hudson's torso which he said were consistent with the victim lying on his back and Jordan "straddling" him while stabbing. McCormick agreed that the wounds, one of which pierced the victim's heart, showed a deliberate attempt to "go for the heart." McCormick also said that these wounds were likely inflicted after Hudson had stopped struggling because "it's almost impossible to put a pattern of four stab wounds in like that as accurately as they are."
The evidence also showed that Jordan beat Hudson in the face and about the head with a lug wrench and that he used both the wrench and his hands to choke Hudson. Jordan did not describe Hudson's conduct as violent and aggressive before the murder until he testified at trial. Jordan did not notify police that Hudson attacked him; indeed, he initially denied any involvement in the offense. The photos of Hudson's body show that Hudson was badly beaten as well as stabbed and strangled, and the only signs of a struggle, i.e. disarray in Hudson's home, were where Hudson lay and where the VCR and CD player were connected; conversely, Detective Hamm saw no signs of injury to Jordan during their interviews and, according to Hamm, Jordan did not complain of any. Dr. McCormick described defensive wounds on Hudson's right arm and hand made "when a victim places some extremity ... between themself and an assailant.... [T]hey're made in warding off an attack." In sum, Jordan told police and the jury inconsistent versions of the events, and in light of the evidence as a whole, the jury was within its discretion to reject his trial testimony.
The inconsistencies in Jordan's versions of events, the defensive wounds to Hudson's arm and hand and the stab wounds inflicted after Hudson had stopped struggling are all indicative of Jordan's specific intent to kill. *961 The jury's decision to reject Jordan's manslaughter argument was rational and he fails to show why it should be overturned on appeal.
On the question of the proof of armed robbery, Jordan admittedly took Hudson's VCR and CD player. He argues that this taking only amounted to a theft. The elements of armed robbery are a taking of anything of value from the person of or in the immediate control of another by use of force or intimidation while armed with a dangerous weapon. La. R.S. 14:64. Notably, simple robbery, which does not require a dangerous weapon, is also one of the crimes enumerated under the first degree murder statute. La. R.S. 14:65, 14:30. The force or intimidation can be applied at any time in the course of the crime. State v. Brown, 96-1002 (La.App. 5th Cir. 4/9/97), 694 So.2d 435, writ denied 97-1310 (La.10/31/97), 703 So.2d 19; State v. Walker, 28,577 (La.App.2d Cir.10/4/96), 681 So.2d 1023.[3] The defendant used homicidal force to accomplish the taking of the electronic items from the victim's home. It is immaterial whether he used such force before taking the electronics, or if he used the force due to being discovered by Hudson.
In sum, a rational jury, viewing the evidence in the light most favorable to the state, could reasonably find that Jordan had the specific intent to kill Hudson in the course of an armed robbery. The jury could also reasonably find that Jordan did not kill Hudson in sudden passion which was immediately caused by provocation sufficient to deprive an average person of self control or cool reflection. Additionally, the evidence did not support the contention that Jordan was intoxicated to the degree that he could not form the specific intent to kill. The evidence presented was sufficient to prove the elements of first degree murder. State v. Meyers, 620 So.2d 1160 (La.1993).

Assignment of Error 1: "inculpatory / exculpatory" statements.
Jordan argues on appeal that the five inculpatory/exculpatory statements were improperly admitted. In response to a motion for discovery, the state provided him with transcripts of his statements to the police. Jordan filed no motion to suppress the statements. La.C.Cr.P. art. 703 F. Nevertheless, at trial the court conducted a hearing to determine whether the statements were made voluntarily, La. R.S. 15:451, and concluded that they were. Jordan objected to the court's ruling, and the jury heard the statements. In its instructions, the court correctly told the jury that prior inconsistent statements could not be used to show that the statements were true but were instead relevant for impeachment purposes.
On appeal, Jordan complains that the statements should not have been admitted because (1) the Miranda warnings were inadequate, (2) the statements were coerced and (3) the court violated his attorney-client privilege.[4]
Jordan complains that the following portion of the Miranda warnings, as read by Detective Hamm, rendered his statements inadmissible:
We have no way of furnishing you with a lawyer, but one will be appointed for you, if you wish, if and when you go to court.
The Louisiana Supreme Court considered the effect of this language in State v. Sterling, 377 So.2d 58 (La.1979). The court, in holding that the language did not render the defendant's statement involuntary, stated that though the language, taken in isolation, may instill doubt in the reader that the defendant was fairly informed of his right, in the full context of the warning, "it cannot be logically concluded that defendant was not aware of his right to refuse to make any statement without the benefit of a lawyer." *962 Id.; see also State v. Worthy, 532 So.2d 541 (La.App. 1st Cir.1988), writ denied 538 So.2d 610 (1989).
The Miranda warning given by Detective Hamm,[5] as that given in Sterling, made it abundantly clear that Jordan had the right to refuse to make a statement and that this right included the right not to make a statement without a lawyer present. Accordingly, the warning was sufficient.
Jordan additionally argues that his statement was given under coercion, that Detective Hamm screamed at him, physically threatened him, and told him what he should say. A confession may be introduced into evidence only when the state shows that it was made freely and voluntarily, and not under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La. R.S. 15:451; State v. Mills, 505 So.2d 933 (La.App. 2d Cir.), writ denied 508 So.2d 65 (1987); State v. Walker, 28,577 (La.App.2d Cir.10/4/96), 681 So.2d 1023. The question of voluntariness is determined by the trial judge from the facts and circumstances of the particular case. State v. Mills, supra; State v. Walker, supra. The judge's conclusions as to the credibility and weight of testimony relating to the voluntariness of a confession will not be overturned unless unsupported by the evidence. Id.
At the hearing, Detective Hamm explicitly denied that he or any other officer coerced Jordan into making the statement. The detective said that he sometimes sat in close proximity to suspects during questioning but could not recall how close he sat to Jordan. The transcripts of Jordan's statements utterly fail to support his contentions that he was drunk or that Detective Hamm was "screaming" at him and forcing his thighs apart during the intervals between statements. Again, Detective Hamm explicitly denied these allegations, stating that Jordan had told him he had AIDS and some type of infection in his genital areas. While Detective Hamm admitted that he likely had his knee between Jordan's legs, he stated that it would have been only the tip of knee and just barely inside of Jordan's legs so he could not turn aside or look away. Detective Hamm stated that he feared contracting AIDS and denied getting very near Jordan. Because the evidence solidly refutes Jordan's allegations of police misconduct, this complaint is without merit.
Jordan additionally argues that his attorney-client privilege was violated during cross-examination. Error may not be predicated upon a ruling which admits evidence unless a substantial right of the party is affected and a timely objection or motion to admonish the jury to limit or disregard appears on the record. La. C.E. art. 103; La.C.Cr.P. art. 921.
In his testimony, Jordan complained of Detective Hamm's conduct during interrogation. On rebuttal, the prosecutor questioned Jordan about his effort, or lack thereof, to have his statements suppressed, including whether he asked his attorney to file a motion to suppress due to intoxication, and why the motion was not filed. Jordan's attorney objected on the basis of attorney-client privilege; the court sustained the objection. The state then asked Jordan whether a motion to suppress was ever filed on his behalf. Counsel did not object, and no further questions addressed any privileged matters.
Jordan's objection to disclosure of communications between himself and his attorney was sustained. The subject was never again broached, and Jordan raised no further objections. Since all privileged communications were excluded, there is no ground for objection. This argument lacks merit.

Assignment of Error # 2 & # 3: Photographic evidence
While Jordan agrees that some of the crime scene and autopsy photos were *963 admissible, he argued at trial and maintains on appeal that it was unnecessary and prejudicial to introduce all of them into evidence. The state responds that all photos were necessary to illustrate important points and that the court excluded some photos that it considered duplicative.
Relevant evidence is evidence which has any tendency to make the existence of any fact that is of consequence more or less probable than it would be without the evidence. La. C.E. art. 401. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403. The trial court's determination regarding the relevancy of evidence is entitled to great weight and should not be overturned absent a clear abuse of discretion. State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991).
Photographs are generally admissible if they illustrate any fact, shed any light upon an issue in the case, or are relevant to describe the person, thing or place depicted. State v. Jackson, 30,473 (La. App.2d Cir.5/13/98), 714 So.2d 87, writ denied 98-1778 (La.11/6/98), 727 So.2d 444; State v. Washington, 30,866 (La.App.2d Cir.8/19/98), 716 So.2d 936. Additionally, the cumulative nature of photographic evidence does not render it inadmissible if it corroborates the testimony of witnesses on essential matters. State v. Langley, 95-1489 (La.4/14/98), 711 So.2d 651. Photographs are not admissible if they are so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. State v. Tolbert, 30,821 (La.App.2d Cir.8/19/98), 716 So.2d 949; State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865, cert. denied ___ U.S. ___, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997). A trial court's ruling in this regard will only be disturbed if the prejudicial effect of the photographs clearly outweighs the probative value. State v. Washington, supra.; State v. Craig, supra.
Jordan argues that crime scene photos, exhibits 25-29 and 31-32, should have been excluded pursuant to his objection that they were irrelevant, cumulative, and prejudicial. The prosecutor told the court that it had culled the photos into the bare necessities to present the case; the court initially agreed to allow only three photos but later allowed all the photos into evidence over Jordan's objection. The photographs show:
S-25 The entire body of the victim, lying as found on the floor. Little if any blood or wound is visible.
S-26 A view of the victim's head and torso, showing how close the victim's head was to a chair behind him and also showing a cigarette butt under the victim's left arm.
S-27 A view including victim's head and torso, centered on the cigarette butt.
S-28 A closer view of the victim's head and torso, showing the location of stab wounds and the position of the victim's hands.
S-29 A close-up of the victim's neck, showing strangulation marks.
S-31 A view from the victim's right side showing his bloody face, his right arm and part of his chest. This photo also shows blood trails leading from the center of the victim's face to the left side of his face; however, the victim's head lies on its right side.
S-32 A close-up of the victim's battered and bloody face, showing blood trails from the center of his face running toward the right side of his face.
Only Exhibits 28, 31 and 32 show any significant amount of blood or wounding. Each is relevant to a different aspect of the state's proof. Additionally, although the photographs may have been cumulative, they were introduced in order to corroborate Detective Hamm's testimony as to the location of the body, his identification of Jordan as a suspect in part due to the fact that the cigarette butt in the picture was extinguished in the same way as he saw Jordan extinguishing one, the defensive wounds on Hudson, and the fact that Hudson was strangled. The photographs also corroborated medical testimony as to defensive wounds, the cause of death, and the fact that Hudson's head had been moved after death. Though graphic, these *964 photos are not gruesome, and their probative value far outweighs their prejudicial effect. Jordan was the only witness to this crime and the photos were the best evidence to refute his version of events. The trial judge did not abuse his discretion by allowing all the photographs of the crime scene to be introduced into evidence.
Jordan re-urged his earlier objection in reference to Exhibits 41-63, photographs of the victim's body lying on the coroner's table. Out of all of these photographs, only S-57 (a view of wounds to the victim's abdomen, similar to S-58) was not discussed in the testimony of Dr. McCormick. That testimony recited in great detail each of the visible injuries to the victim. Referring to the photos, the doctor described the manner and severity of injury, and each photo illustrated something worthy of the doctor's comment. None of the photos were bloody; the blood had been cleaned from the victim's body before the pictures were taken, and with the doctor's testimony each of the photos illustrates the method and manner of the defendant's attack.
Since Dr. McCormick's testimony was informative, the photos were not gruesome, and the State needed to convey to the jury the true nature of the incident, the court did not err in admitting the entirety of the autopsy photos.

Assignment of Error # 4: Incorrect statement of law by prosecution.
Jordan appeals the trial court's refusal to sustain his objection to remarks made by prosecution in closing arguments.
A misstatement of the law by the prosecution does not prejudice a defendant if the judge subsequently admonishes or correctly instructs the jury. State v. Roy, 95-0638 (La.10/4/96), 681 So.2d 1230, cert. denied, 520 U.S. 1188, 117 S.Ct. 1474, 137 L.Ed.2d 686 (1997). Additionally, a prosecutor's misstatement of the law during the voir dire, or in his opening and closing remarks, does not necessarily require the reversal of a defendant's conviction if the trial court properly instructed the jury at the close of the case. State v. Robertson, supra; State v. Roy, supra; State v. Burge, 362 So.2d 1371 (La.1978); State v. Monroe, 626 So.2d 398 (La.App. 4th Cir.1993), writ denied, 93-2830 (La.2/4/94), 633 So.2d 168.
The defendant's ability to distinguish right from wrong has seldom been discussed in the context of voluntary intoxication. See, e.g., State v. Scott, 344 So.2d 1002 (La.1977). However, it is clear that the so-called "McNaughton" test is not incorporated into La. R.S. 14:15(2). A defendant's ability to distinguish right from wrong is a separate inquiry from whether the defendant is capable of forming the specific intent to kill or to commit great bodily harm. State v. Ellis, 28,282 (La.App.2d Cir.6/26/96), 677 So.2d 617, writ denied, 96-1991 (La.2/21/97), 688 So.2d 521.
In his closing argument, the prosecutor stated that voluntary intoxication meant, "you must not be able to tell the difference between right and wrong." Jordan's attorney objected, and at side bar argued that prosecution was giving an incorrect statement of law; that prosecution was stating the McNaughton test for temporary insanity, not the intoxication defense of inability to form specific intent. The court did not rule on the objection, and prosecution reiterated the statement in his closing argument and again in rebuttal. The prosecutor clearly made an incorrect statement of law; Jordan's objection had merit and the court should have prevented the prosecutor from making further misstatements.
In its charge, the trial court told the jury that it had the duty to accept and apply the law as given by the court, that the statements and arguments of counsel were not evidence, and subsequently read to the jury the statutory definition of the intoxication defense, La. R.S. 14:15. In giving these instructions, the trial court corrected the misstatement of law. Since there is no showing that Jordan was prejudiced by the prosecutor's misstatement, this assignment does not present reversible error. See also, State v. Warren, 28,889 (La.App.2d Cir.12/11/96), 712 So.2d 500.

Assignment of Error # 5Motion for new trial
The defendant filed a motion for new trial on the grounds that his jury venire was *965 not empaneled in accordance with La.C.Cr.P. art. 408.1. That article, as it currently reads, became effective on August 15, 1997, and voir dire began in Jordan's trial on September 22, 1997. The trial court denied the motion on December 12, 1997.
La.C.Cr.P. art. 408.1 provides:
In developing a list of all persons who may be called for grand or petit jury duty, a jury commission shall draw names from a master list derived from voter registration lists, lists of actual voters, motor vehicle license and registration records, lists of individual utility customers, if made available by the utility company, and such other sources as may be approved by a majority of the district judges of the judicial district for which the master list is compiled.
A petit jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury, or persons were systematically excluded from the venires solely upon the basis of race. La.C.Cr.P. art. 419. The defendant bears the burden of proving grounds for setting aside the venire. State v. Lee, 559 So.2d 1310 (La.1990), cert. denied 500 U.S. 938, 111 S.Ct. 2068, 114 L.Ed.2d 472 (1991). The amended article does not specifically invalidate the general venire in use, rather it speaks prospectively of future lists which are in the development stage. State v. Rutledge, 30,718 (La.App.2d Cir.11/6797), 712 So.2d 138, writ denied 97-2881 (La.11/25/97), 703 So.2d 635. Additionally, the Louisiana Supreme Court gave the 33rd Judicial District Court a reasonable time, not to exceed March 1, 1998, in which to reconstitute venires according to art. 408.1. State v. Ashworth, 97-2917 (La.11/25/97), 704 So.2d 228.
Jordan's argument that Rutledge and Ashworth are incorrect would lead to the conclusion that the legislature intended to prohibit trials by jury until the various clerks of court revised jury selection procedure. Rutledge, supra. We decline to draw that conclusion. Additionally, Jordan has not shown that fraud was committed, irreparable injury was done, or that individuals were systematically excluded from the venire based on race. State v. Lee, supra; La.C.Cr.P. art. 419. Notably, Jordan did not make a motion to quash the venire; instead he raised the issue by a motion for new trial. He has not shown that the procedure for drawing the venire worked any injustice in his case, so the trial court correctly denied the motion. La. C.Cr.P. art. 851.

Assignment of Error # 6: Imposing "hard labor" and denying bail
At sentencing, Jordan informed the court of his health problems, including his diagnosis with AIDS, and moved that his sentence be imposed without hard labor because of these problems. The court denied the motion over Jordan's argument that the hard labor sentence was constitutionally excessive.
"Whoever commits the crime of first degree murder shall be punished by death or life imprisonment at hard labor." La. R.S. 14:31; See La.C.Cr.P. art. 905.8. The trial judge was statutorily mandated to sentence Jordan to life imprisonment at hard labor.[6]
Inmates housed with the Department of Corrections may be employed at various tasks, and their work is compensated. La. R.S. 15:832. However, the term "hard labor" refers not to the character of the work which an inmate may be called upon to perform but instead refers to the inmate's status as a prisoner of the Department of Corrections. The legislature has recognized in La. R.S. 15:832 that some inmates may be incapable of working due to their poor health. That determination will be made by the Department of Corrections. As such, Jordan's health as it relates to his ability to work is immaterial to the "hard labor" portion of the sentence. The trial judge was correct in denying Jordan's motion.
Jordan also appeals the trial court's denial of his motion for post-conviction bail, seeking bail in order to get medical treatment in a facility in Ohio near his family. *966 However, after conviction of a capital offense, the defendant is not allowed bail. La.C.Cr.P. art. 332 E. The district court did not have authority to grant Jordan bail, nor does this court. Notably, medical care is provided for both parish prisoners and inmates with the Department of Corrections. See La. R.S. 15:703; 15:831.

Conclusion
For the above reasons, we affirm the defendant's conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Police found Soma tablets, along with other drugs, in Hudson's home.
[2] In Hudson's apartment, police found cocaine at the bottom of a glass matching the description of the one Jordan said that he drank from.
[3] In State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8, cert. denied, ___ U.S. ___, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998), the fact that defendant took and sold items from the victims' home to buy crack, returned to their home and killed them, and then took other items from the home before leaving did not prevent the finding that the crime was an armed robbery. In State v. Brown, supra, the fact that the defendant shot the victim while he slept did not prevent a similar finding.
[4] The state has not argued that Jordan's failure to file a motion to suppress precludes him from raising these complaints.
[5] The warning given by Detective Hamm was as follows: "You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. You have this same right to the advice and presence of a lawyer even if you cannot afford to hire one. We have no way of furnishing you a lawyer, but one will be appointed for you, if you wish, if and when you go to court. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer."
[6] Notably, an individual who has been convicted of intentional exposure to AIDS virus, a violation of La. R.S. 14:43.5, can be sentenced to not more than ten years imprisonment, with or without hard labor.